UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NORTHLAND CAPITAL FINANCIAL SERVICES, LLC, | |
| Plaintiff, | No. 24 CV 7352 |
| v. | Judge Manish S. Shah |
| TOTO EXPRESS LLC, FUGASO LLC, POWER BURN CAPITAL LLC, and ANDREI TONCU, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Northland Capital Financial Services sued defendants Toto Express, Fugaso, Power Burn Capital, and Andrei Toncu for breach of contract after Toto Express failed to make payments on trailers that Northland Capital had purchased. Northland Capital moves for summary judgment. For the reasons discussed below, the motion is granted in part.

I.     **Legal Standards**

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a dispute of material fact regarding any essential element of her legal claims on which she bears the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir.

2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II.    Facts

In May 2023, plaintiff Northland Capital and defendant Toto Express entered into six agreements collectively called the "equipment lease agreement." [46] ¶¶ 8–14.[1] The agreements were grouped into two "leases": Lease 002 and Lease 1993G. [46] ¶¶ 8–14.[2] As part of the agreements, Toto Express took possession of six trailers. [46] ¶ 15. In exchange, Toto Express agreed to pay forty-eight monthly payments of $3,893.18 to Northland Capital for Lease 002, and forty-eight monthly payments of $3,893.18 for Lease 1993G. [46] ¶ 16. Toto Express's failure to pay the sums constituted a default under both leases. [46] ¶ 17. Upon default, Northland Capital could declare the casualty value and other amounts payable to be immediately due and payable, proceed with court action to enforce performance or recover damages, or take possession of the equipment. [46] ¶ 18.

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. The facts are largely taken from the defendant's response to plaintiff's Local Rule 56.1 statement of facts, [46], and plaintiff's response to defendant's statement of additional facts, [48], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). To the extent that disputed facts are relevant and the parties rely on admissible evidence, I include both sides' version, understanding that the nonmovant is entitled to favorable inferences.

[2] Northland Capital says the agreement was a true lease agreement; defendants dispute that it is a true lease, and instead, say the agreement was a disguised security agreement.

Toto Express agreed to assume and bear the entire risk of loss, theft, destruction, damage, condemnation, or other casualty of the equipment. [46] ¶ 19. Toto Express was also required to obtain and maintain its own expense liability insurance, and name Northland Capital as an additional insured and sole lender loss payee for property damage coverage. [46] ¶¶ 20–21. At the end of the lease term, Toto Express could purchase the equipment for not more than ten percent of Northland Capital's total cost of the equipment. [48] ¶¶ 8–9. Toto Express would be penalized for paying off the agreement early. [48] ¶ 13.

As an inducement to Northland Capital to enter into the equipment lease agreement, defendants Fugaso, LLC, Power Burn Capital, LLC, and Andrei Toncu each executed a continuing guaranty for both leases. [46] ¶¶ 22, 25, 28. Each guaranteed that Toto Express would make all payments, pay all other charges, and fully and promptly perform all other obligations required under the equipment lease agreement. [46] ¶ 24, 27, 30. Toncu also guaranteed that he would pay all costs incurred by Northland Capital in collection and enforcement of the equipment lease agreement and guarantees, including collection charges, court costs, and attorneys' fees. [46] ¶ 31. Northland Capital says it relied on these guarantees in consideration for entering into the equipment lease agreement. [46] ¶¶ 23, 26, 29; [41-1] ¶¶ 22, 25, 28.[3]

---

[3] Defendants deny that Northland Capital relied on the guarantees but do not cite to any evidence in the record to support their denial.

3

Toncu said the leases were a purchase, and told Northland Capital that Toto Express would be subleasing the trailers to other trucking companies. [46] at 19–20 (¶¶ 3–4); [48] ¶¶ 2, 6, 17. The equipment lease agreement says that the lessee has "no right to sell, transfer, assign, or sublease the equipment or this lease without our prior written consent and any such event shall constitute an immediate event of default." [41-2] at 4 (§ 15).

Northland Capital fully performed its obligations under the equipment lease agreement and three guarantees. [46] ¶ 32. It purchased six trailers for $59,000 each. [48] ¶ 10. Toto Express made advance payments of $17,700 on each lease. [48] ¶ 11.

In late 2023, troubles in the trucking industry led to Toto Express being unable to make its lease payments and it sought to sublease the equipment to another trucking company. [46] at 20 (¶ 6); [48] ¶¶ 4, 19. Northland Capital refused the sublease request. [46] at 22 (¶ 18); [48] ¶ 20.[4] In January 2024, Toto Express failed to make its scheduled monthly payments. [46] ¶ 26.[5] Toto Express has not made a payment since then. [46] ¶ 26. On January 10, Northland Capital sent all defendants notice of default letters. [46] ¶ 27. Northland Capital exercised its rights, and Toto Express voluntarily returned five trailers between January and March of 2024. [46] ¶¶ 28–29; [48] ¶ 16. Four of the trailers were sold at auction for $32,000 each, and

---

[4] Northland Capital disputes this fact and says that Northland Capital repossessed the equipment after Toto Express failed to make required lease payments. This is not mutually exclusive with Toto Express's assertion that Northland refused to allow subleasing.

[5] The numbering of plaintiff's statement of facts restarts at 26. From this point forward, the facts cite to the second set of numbers, starting on page 9 of the defendants' response to plaintiff's statement of material facts. [46] at 9.

4

the proceeds were applied to Toto Express's obligations under the equipment lease agreement. [46] ¶¶ 30–31. A dealer sold the fifth trailer for $49,500, which was applied to Toto Express's obligations under the equipment lease agreement. [46] ¶ 32.

The sixth trailer was damaged and declared a total loss by Progressive Insurance in January 2024. [46] ¶ 33. Progressive recovered the trailer and issued an insurance claim payment to Northland Express for $59,500. [46] ¶ 34.

The defendants have not paid the amount Northland Capital claims is still owed. [46] ¶ 35. Northland Capital claims that as of July 31, 2025, defendants owe $111,691.66 on Lease 002 and $60,724.50 on Lease 1993G. [46] ¶ 36; [41-1] at 10. Northland Capital says Toto Express failed to timely pay its insurance premiums and did not indemnify Northland Express for insurance premiums. [48] ¶¶ 14–15; [48-14] at 2; [48-15] at 2. Defendants dispute that amount. They say that the charges are unreasonable liquidated damages, that Northland Capital is charging a residual fee for both leases, and that Northland Capital is charging insurance even though Toto Express had insured the equipment. [46] ¶ 36; [48] ¶ 14. Instead, defendants say that the total costs remaining are $48,834.10 on Lease 002 and $1,165.90 on Lease 1993G. [48] ¶ 21.

Northland Capital also says it has incurred $25,172.50 in attorneys' fees. [46] ¶ 37.

5

### III.    Analysis

### A.    Liability

Northland Capital says that the equipment lease agreement is a true lease and that defendants breached the lease by failing to make monthly payments.[6] Defendants argue that the equipment lease agreement is not a true lease, but rather, a disguised security agreement. Under Minnesota law, the interpretation of unambiguous contracts is a question of law for the court to determine. *Hampton v. Kohler*, 989 F.3d 619, 622 (8th Cir. 2021).[7] A contract is ambiguous if its terms are susceptible to more than one reasonable interpretation, but its terms are not ambiguous simply because the parties' interpretations differ. *Id.* at 622–23.

"[W]hether a financing transaction denominated as a 'lease' is a true lease or a disguised security agreement is one of the most vexatious and oft-litigated issues under the Uniform Commercial Code." *Prospect ECHN, Inc. v. Winthrop Res. Corp.*, 75 F.4th 885, 890 (8th Cir. 2023).  A finance lease is a lease in which the lessor does not select, manufacture, or supply the goods, the lessor acquires the goods or the right to possession and use of the goods in connection with the lease, and the lessee receives a copy of the contract evidencing the lessor's purchase of the goods or a disclaimer

---

[6] I have diversity jurisdiction under 28 U.S.C. § 1332. Northland Capital is a citizen of Minnesota, because both its members are Minnesota businesses with their principal place of business in Minnesota. [46] ¶ 1. Andrei Toncu is a citizen of Illinois. [46] ¶ 2. He was the sole member of Toto Express, Fugaso, and Power Burn. [46] ¶ 2. The current sole member of Fugaso is Iana Tokareva, who is a citizen of Illinois. [46] ¶ 2. The amount in controversy exceeds $75,000. [46] ¶¶ 4.

[7] Pursuant to the equipment lease agreement's choice-of-law provisions, Minnesota law governs. [41-2] at 5 (§ 21); [41-5] at 5 (§ 21). *C.H. Robinson Worldwide, Inc. v. Traffic Tech, Inc.*, 60 F.4th 1144, 1148 (8th Cir. 2023).

statement on or before signing the lease contract. Minn. Stat. § 336.2A-103(1)(g). Under a finance lease, the lessee "selects equipment and suppliers, and the lessor provides funds to purchase the equipment." *Prospect ECHN*, 75 F.4th at 887. A security interest is an interest in personal property which secures payment or performance of an obligation. Minn. Stat. § 336.1-201(b)(35).

The UCC provides a two-part bright-line test to determine whether a transaction is a disguised security agreement: a transaction in the form of a lease creates a security interest if (1) "the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee" and (2) one of four conditions, Minn. Stat. § 336.1-203(b):

> (i)  the original term of the lease is equal to or greater than the remaining economic life of the goods,
>
> (ii)  the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (iii)  the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, *or*
>
> (iv)  the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

If both conditions are met, the transaction is a security interest as a matter of law. *Prospect ECHN*, 75 F.4th at 891.

Here, the consideration that defendants were to pay Northland Capital was not subject to termination. The lease said that it was "non-cancellable" and that Toto

Express's "obligations hereunder shall survive expiration or termination for any reason of the lease." [41-2] at 5 (§ 18); [41-5] at 5 (§ 18). Northland Capital points to the early payoff agreement, which allowed Toto Express to pay off the lease in its entirety before the end of the original term, with certain prepayment fees on the outstanding lease balance through thirty-six months, to support its argument that the lease was cancellable. But the agreement requires Toto Express to pay the full amount due under the lease, and Toto Express "could not terminate the obligation to pay the consideration due to [the lessor] under the … agreement." *In re QDS Components, Inc.*, 292 B.R. 313, 334 (Bankr. S.D. Ohio 2002) (alterations in original).[8] That is enough to show Toto Express's obligation was non-terminable. *See id.*; *In re Ajax Integrated, LLC*, 554 B.R. 568, 579 (Bankr. N.D.N.Y. 2016) ("Since Debtor could not terminate the Agreement without paying all amounts then due and those that would become due, including the $16,900 Purchase Option, the court finds the first prong of the Bright Line Test to be satisfied.").

The purchase price at the end of the lease term is nominal, satisfying the second condition for a security agreement. Toto Express had the option to purchase the trailers at the end of the lease terms for at most ten percent of the price Northland Capital paid for the trailers ($17,700 total, or $5,900 per trailer). [48] ¶ 12; Minn. Stat. § 336.1-203(c)(4). "Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the

---

[8] "In the UCC Context, decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC." *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 n.7 (10th Cir. 2008).

option is not exercised." Minn. Stat. § 336.1-203(d). Courts have found that a purchase option price of ten percent of the original purchase or list price of a good is nominal. *In re Ecco Drilling Co., Ltd.*, 390 B.R. 221, 229 (Bankr. E.D. Tex. 2008) (fifteen percent option price was nominal); *In re Triplex Marine Maintenance, Inc.*, 258 B.R. 659, 670 (Bankr. E.D. Tex. 2000) (ten percent option price was nominal); *In re Wakefield*, 217 B.R. 967, 971 (Bankr. M.D. Ga. 1998) (ten percent option price was nominal); *Kimco Leasing, Inc. v. State Bd. of Tax Comm'rs*, 656 N.E.2d 1208, 1215 (Ind. Tax Ct. 1995) (twenty-five percent option price was nominal). Under the percentage test, the ten percent option price is nominal.[9]

Some courts have criticized percentage tests "as an unreliable determinant of option price nominality." *QDS Components*, 292 B.R. at 327 (collecting cases). Many of those courts consider whether the lessee has "no sensible alternative other than to exercise the purchase option." *In re Grubbs Constr. Co.*, 319 B.R. 698, 716 (Bankr. M.D. Fla. 2005) (collecting cases). By the end of the lease, Toto Express would have had the option in each agreement to buy the trailers for no more than $17,700. [48] ¶¶ 8–9. If Toto Express chose to return the trailers, they would be sold, and the proceeds would first go to the expenses of sale, then to Northland Capital up to $17,700 as an "adjustment to rent," and if there was money left over, to Toto Express. [41-4] at 2; [41-7] at 2. If the proceeds of the sale were less than the expenses of the

---

[9] Other courts look to whether the option price is a relatively low percentage of the total lease payments to determine whether the price is nominal. *Triplex Marine*, 258 B.R. at 670. The agreement's purchase option price of (at most) $17,700 is about 8.7 percent of the total rental price, which has been considered nominal. *Orix Credit All., Inc. v. Pappas*, 946 F.2d 1258, 1261–62 (7th Cir. 1991) (option price of twelve percent of total rental price was nominal).

sale and the rent adjustment to Northland Capital, Toto Express would owe Northland Capital the deficiency. [41-4] at 2; [41-7] at 2. Toto Express would also be responsible for delivering the equipment "in a condition as good as received, less normal wear and tear, to any place in the United States designated by us." [41-3] at 2; [41-6] at 2. Toto Express would be required to prepay all the expenses of crating and shipping by means Northland Capital designated, to insure the shipment, and to pay a reasonable administrative fee for process the equipment (up to $500). [41-3] at 2; [41-6] at 2. *Ajax Integrated*, 554 B.R. at 581–82 (cost to debtor of transporting and ensuring equipment was in the same condition as received made purchase option price nominal); *In re Buehne Farms, Inc.*, 321 B.R. 239, 246 (Bankr. S.D. Ill. 2005) (removal of cows at the debtor's expense contributed to a finding that the purchase price was nominal). Because the purchase option price was not set, but instead capped at ten percent of $177,000, Toto Express would be able to negotiate a lower price. Even if the actual purchase option price was $17,700, considering Toto Express's obligation to pay for the costs to repair, ship, insure, and deliver the trailers back to Northland Capital, and pay an administrative fee of up to $500, the purchase price is nominal; it would not make economic sense to decline to exercise the option.

Because both conditions of the bright-light test have been met, the agreement is a security agreement as a matter of law. Minn. Stat. § 336.1-203(b).

But even if the agreement did not meet the per se test, the agreement is a disguised security agreement under the "economic realities" test. Under that test, I look to "the specific facts of the case to determine whether the economics of the

transaction suggest such a result." *Prospect ECHN*, 75 F.4th at 892 (quoting *In re*

*Pillotex, Inc.*, 349 F.3d 711, 717 (3d Cir. 2003)). The ultimate question is whether

Northland Capital retained a "meaningful reversionary interest—either an upside

right or a down-side risk," and if so, the parties have signed a lease, not a security

agreement. *Id.*

A transaction is not a security agreement "merely because," Minn. Stat.

§ 336.1-203(c):

> (1) the present value of the consideration the lessee is
> obligated to pay the lessor for the right to possession
> and use of the goods is substantially equal to or is
> greater than the fair market value of the goods at the
> time the lease is entered into;
>
> (2) the lessee assumes risk of loss of the goods;
>
> (3) the lessee agrees to pay, with respect to the goods,
> taxes, insurance, filing, recording, or registration fees,
> or service or maintenance costs;
>
> (4) the lessee has an option to renew the lease or to become
> the owner of the goods;
>
> (5) the lessee has an option to renew the lease for a fixed
> rent that is equal to or greater than the reasonably
> predictable fair market rent for the use of the goods for
> the term of the renewal at the time the option is to be
> performed; or
>
> (6) the lessee has an option to become the owner of the
> goods for a fixed price that is equal to or greater than
> the reasonably predictable fair market value of the
> goods at the time the option is to be performed.

Defendants argue that the option to buy the equipment at the end of the

agreement term was nominal, that they were obligated to pay more than the fair

market value of the equipment at the time of the agreement, that they were

responsible for the maintenance, service, and repair of the equipment, and that they

were required to bear all costs of insurance, loss, and taxes. Northland Capital argues

11

these features did not make the agreement a disguised security agreement. *See* Minn. Stat. § 336.1-203(c). I agree that, standing alone, any one factor would not mean the agreement is a security agreement. But the agreement here contains at least four of the subsection (c) factors and includes other indicia of a security agreement.

The value of the equipment at the beginning of the lease was $177,000. Over the course of each agreement, defendants were expected to pay $186,872.64 in "rent," and $17,700 as an "advance," for a total of $204,572.64 on each contract. [46] ¶ 16; [41-2] at 2; [41-5] at 2.[10] This is about 15.6 percent more than the initial cost of the equipment. Minn. Stat. § 336.1-203(c)(1). *See Prospect ECHN*, 75 F.4th at 893 (distinguishing where a lessee pays the equipment's purchase price from where the lessee pays more than the full purchase price); *Orix Credit All., Inc. v. Pappas*, 946 F.2d 1258, 1262 (7th Cir. 1991) (where rental payments exceeded the purchase price by about twenty percent, "the total rental payments may represent the fair market value of the trailers plus a financing charge"); *Grubbs*, 319 B.R. at 720 (certainty of a return of the lessor's entire principal and a predetermined calculated interest rate indicated a disguised security agreement); *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 814 (Bankr. D. Del. 1997) (where the lessor receives consideration that amounts to a return on its investment, a sale is likely to have been intended). If, as it appears from Northland Capital's arguments, the $17,700 "advance" does not apply to the

---

[10] It is not clear whether the "advance" would apply to defendant's total obligation or is a separate consideration. In Northland Capital's damages calculation, the advance did not apply to the principal of the debt. I have added that cost to the amount owed in rent payments to determine the total consideration defendants agreed to. But even if the advance was applied to defendant's rent obligations, it would not change my analysis.

rent payments, defendants will have paid over $27,000 more over the course of each agreement than the value of the trailers at the time Northland Capital bought them. This amounts to a return on Northland Capital's investment and indicates a sale. *Edison Bros*, 207 B.R. at 814.

Toto Express was also responsible for the maintenance, service, and repair of the trailers, was required to pay for all insurance for the trailers, bore the entire risk of any loss, and was also responsible for the payment of taxes associated with the trailers. [46] ¶¶ 19–21; Minn Stat. § 336.1-203(c)(2), (3). These are all signs of a security agreement, and not a lease. *See Grubbs*, 319 B.R. at 720.

"Perhaps the most revealing provisions of the 'lease agreement' are those relating to 'termination' and 'return of [equipment].'" *Id.* at 718. These provisions often "recognize the equity of the 'lessee' in the equipment because the lessee is required to bear the loss or receive the gain from its wholesale disposition." *Id.* Toto Express had the option to either purchase the trailers or return the trailers to Northland Capital to be sold. Any surplus from the sale would go to Toto Express, and any deficiency would be owed by Toto Express to Northland. [41-4] at 2; [41-7] at 2. Minnesota law recognizes that an adjustment to rental payments based on the sale proceeds does not create a security interest on its own. Minn. Stat. § 168A.17(1a). But, as with the § 336.1-203(c) factors, it is one factor that supports the finding of a security interest. That Toto Express would receive gain from the wholesale disposition gives it equity in the trailers—"one of the distinctive characteristics of a lease intended for security." *Grubbs*, 319 B.R. at 718; *see also In re Lasting*

13

*Impressions Landscape Contractors, Inc.*, 579 B.R. 43, 56 (Bankr. D. Md. 2017) (security agreement created where a lessor "will only receive the residual value of the leased property at the end of the lease term"); *In re Kentuckiana Med. Ctr. LLC*, 455 B.R. 694, 701 (Bankr. S.D. Ind. 2011) (where "all the cost and risk of selling used and specialized equipment" falls on debtor, security interest is created). And that Northland would recover any deficiency from Toto Express also creates an "equity or pecuniary interest in the lessee." *Grubbs*, 319 B.R. at 719.

Other factors that indicate the equipment lease agreement was a security agreement include that the defendants were liable "unconditionally for all rental payments and without regard to whether the equipment is defective," [41-2] at 3 (§ 7), [41-5] at 3 (§ 7); that the lease specifically excluded any warranties, [41-2] at 3 (§ 7), [41-5] at 3 (§ 7); that the lease included a general indemnity clause under which Toto Express agreed to indemnify Northland Capital for any and all claims relating in any way to the lease or equipment, [41-2] at 4 (§ 13), [41-5] at 4 (§ 13); and that Northland Capital clearly did not have any expectation of keeping the trailers at the end of the lease term for the purpose of leasing them again to third parties, [41-3], [41-4], [41-6], [41-7]. *Grubbs*, 319 B.R. at 720–21; *In re Noack*, 44 B.R. 172, 175 (Bankr. E.D. Wis. 1984).

The agreements also include a "further assurances" provision granting Northland Capital the authority to "file any financing statements necessary to protect and preserve our ownership of or rights in the Equipment." [41-2] at 5 (§ 24); [41-5] at 5 (§ 24). The provision says Northland Capital "may file or record a copy of this

14

Lease as a financing statement." [41-2] at 5 (§ 24); [41-5] at 5 (§ 24). *See Pipkin v. Sun State Oil, Inc.*, 273 So.3d 828, 845 (Ala. 2018) (agreement was a disguised security agreement where it provided that "a UCC-1 Financing Statement governing the loaned equipment" should be filed with the Florida Secretary of State); *In re APB Online, Inc.*, 259 B.R. 812, 820 (Bankr. S.D.N.Y. 2001) (agreement permitting the lessor to execute a UCC financing statement evidence of a disguised security agreement).

And finally, as explained above, the purchase option price was nominal, indicating a security agreement, not a lease.

Northland Capital argues that the agreement itself made clear it was a finance lease, not a security agreement. [47] at 6. The stated intent of the parties in the agreement will govern whether the agreement is a lease or security interest, unless it is proved "by a preponderance of the evidence that the terms of the lease agreement cannot be reconciled with the stated intent." Minn. Stat. § 168A.17(1a). For all the reasons I have explained, the preponderance of the evidence shows that the equipment lease agreement was a disguised security agreement, notwithstanding the parties' stated intent.

Defendants argue that summary judgment should be denied because the agreement was a disguised security agreement. But even though the agreement was a security agreement, there is no genuine dispute of material fact that the defendants defaulted on their obligations under the agreement and guarantees.

15

Whether a lease or a security agreement, plaintiff's claims are for breach of contract—the equipment agreement and the guarantees.[11] Under Minnesota law, the elements of a breach of contract claim are: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Placzek v. Mayo Clinic*, 18 F.4th 1010, 1016 (8th Cir. 2021) (quoting *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014)). There is no dispute that the agreements are contracts or that Northland Capital performed its part of the agreements. Nor is there any genuine dispute that defendants breached. Defendants admit that in January 2024, Toto Express failed to make its scheduled monthly payments and missed every monthly lease payment since that time. [46] ¶ 26.[12] Toto Express and the guarantors have failed to pay the amounts due and owing under the equipment lease agreement and guarantees. [46] ¶ 35. The defendants defaulted on their obligations. Plaintiff is entitled to judgment as a matter of law on its breach of contract claims.

**B.     Damages**

Defendants argue that there are disputes of fact barring summary judgment on the issue of damages. In particular, they argue that Northland Capital did not consider the $37,165.90 that Toto Express already paid to Northland Capital, and

---

[11] Plaintiff withdrew its claims for replevin and detinue. [42] at 1 n.1.

[12] This citation is to the second ¶ 26.

that the defendants insured the equipment, and so they should not be charged for insurance costs.

Upon defendants' default, Northland Capital had the right to take possession of the trailers and sell them. Minn. Stat. §§ 336.9-609(a), 336.9-610(a). The proceeds of the sale should first cover the expenses of retaking, holding, preparing for disposition, processing, and disposing of the trailers, and to reasonable attorneys' fees and legal expenses. Minn. Stat. § 336.9-615(a)(1). The remaining proceeds should be applied to satisfy defendants' obligations under the agreement. Minn. Stat. § 336.9-615(a)(2). Defendants are liable for any deficiency after the sale. Minn. Stat. § 336.9-615(d)(2).

The agreement states that upon default, Northland Capital may take possession of the equipment, and that even upon repossession, Toto Express remains liable for the "full performance of all obligations on your part to be performed under this Lease including the payment of all Rent, maintenance of all insurance and indemnification of us." [41-2] at 5 (§ 17); [41-5] at 5 (§ 17). The agreement also says that Northland Capital is entitled to attorneys' fees and reasonable expenses in bringing suit to enforce their rights under the agreement. [41-2] at 5 (§ 17); [41-5] at 5 (§ 17).

There is no dispute that Toto Express owed forty-eight monthly payments, and that at the time of the default, it still owed forty-three payments. Defendants are obligated to pay those payments under the agreement and guarantees. They still owe $167,406.74 in payments on each "lease."

17

Because the transaction is a security agreement, Northland Capital is not entitled to the residual value of the trailers. *Orix Credit All.*, 946 F.2d at 1263. Awarding damages for this value "rests on the characterization of [the] transaction as [a] true lease." *Id.* (quoting *Leasing Serv. Corp. v. Carbonex, Inc.*, 512 F.Supp. 253, 259–60 (S.D.N.Y. 1981)) (alterations in original).

The defendants argue that Northland Capital did not give credit for $37,165.90 in payments Toto Express made. But Northland Capital did—it gave Toto Express credit for five months of payments ($19,465.90). The remaining $17,700 was an "advance payment" that Toto Express agreed to pay at the time the lease was signed. [41-2] at 2; [41-5] at 2. This was part of the consideration for the agreement, and there is no evidence that Northland Capital failed to account for the advance in its damages calculation.

Defendants also argue that they had the equipment insured and should not be charged for insurance costs. Northland Capital responds that while defendants had insured the trailers, they failed to pay the insurance premiums that Northland Capital advanced. Defendants' exhibits only show that defendants obtained insurance, not that they paid the insurance premiums. Northland Capital's evidence shows that as of January 10, 2024, Northland Capital was seeking $302.98 for insurance premiums on each lease. It is not clear whether there is a factual dispute or the parties are talking past each other on the issue of insurance premiums as damages. On the current record, I am unable to calculate those damages with certainty.

For Lease 002, Northland Capital sold the three trailers for a total of $96,000.00. The costs of repossessing, selling, and legal and collection fees must be taken from that sum. Minn. Stat. § 336.9-615(a)(1). As of January 31, 2025, the legal fees for Lease 002 were $6,197.00, collection fees were $250.00, repossession fees were $1,290.00, and selling costs were $10,935.00. [41-1] at 10. That leaves $77,328.00. There was an unpaid balance of $167,406.74 in "rent" payments and late fees of $3,003.98. Subtracting the remaining sale proceeds, defendants owe $93,082.72.

For Lease 1993G, Northland Capital received a total of $141,000.00 for the three trailers. As of January 31, 2025, the legal fees for this lease were $6,197.00, collection fees were $500.00, repossession fees were $430.00, and selling costs were $6,120.00. [41-1] at 10. $127,753.00 of the proceeds remains. There was an unpaid balance of $167,406.74 in "rent" payments, $2,391.82 in late fees, and a $35.00 "NSF" fee. Subtracting the remaining sale proceeds, defendants owe $42,080.56.

## V.    Conclusion

Plaintiff's motion for summary judgment, [40], is granted as to liability. The final award of damages will be determined after additional proceedings.

ENTER:

Manish S. Shah
United States District Judge

Date: February 24, 2026